WIGHT et al. v. WASHOE COUNTY BANK et al.

(Circuit Court of Appeals, Ninth Circuit. July 1, 1918.)

No. 3091.

1. BANKS AND BANKING ⬥42—LIEN ON STOCK.
   Facts *held* to support a finding that the bank did not have knowledge of plaintiff's ownership at the time it acquired a lien on the stock while in the name of another.

2. BANKS AND BANKING ⬥42—LIENS ON STOCK.
   Delay of a bank in enforcing a lien, which it had under its by-laws against the stock of an apparent owner for any indebtedness owing the bank, did not raise an equity in favor of a third person, who was actual owner of the stock, where the bank had no knowledge of such ownership.

3. BANKS AND BANKING ⬥42—LIEN ON STOCK—WAIVER.
   Where by-law of bank gave it a lien on stock for any debts due it, the bank did not waive its lien by taking other security for a loan to a stockholder.

4. APPEAL AND ERROR ⬥719(1)—MATTERS REVIEWABLE—ASSIGNMENTS OF ERROR.
   A point not presented by an assignment of error cannot be considered on appeal.

5. MARSHALING ASSETS AND SECURITIES ⬥7—APPLICATION.
   The doctrine of marshaling of assets, to the effect that a creditor cannot assert a lien on the property of a third person, where by his own negligence he has allowed other property in which the third person has no interest to become valueless, has no application, where a bank by its by-laws had a lien on corporate stock for debts due by an apparent stockholder, who had borrowed money and put up security, which the bank allowed to become valueless, where the bank had no knowledge that a third person was the actual owner of the stock.

Appeal from the District Court of the United States for the District of Nevada; Edward S. Farrington, Judge.

Action by Clara M. Wight and Otis B. Wight, her husband, and Gertrude M. Gregory and T. T. C. Gregory, her husband, as stockholders of the Estate of W. O'H. Martin, Incorporated, against the Washoe County Bank and others, to compel the bank to transfer on its books certain shares of stock. Decree for defendants, and plaintiffs appeal. Affirmed.

Mastick & Partridge, John S. Partridge, and Alan C. Van Fleet, all of San Francisco, Cal., and Cole L. Harwood, of Reno, Nev., for appellants.

Harwood & Springmeyer, of Reno, Nev., for appellee Estate of W. O'H. Martin, Inc.

A. E. Cheney, S. S. Downer, and Cheney, Downer, Price & Hawkins, all of Reno, Nev., for other appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. Clara M. Wight and others, appellants, sued as stockholders of the Estate of W. O'H. Martin, Incorporated, to compel the Washoe County Bank, appellee, a Nevada corporation,

to transfer on its books 50 shares of its stock standing in the name of Harry M. Martin, and for accrued dividends. Upon a trial these facts were developed:

W. O'H. Martin died in 1901, owning 300 shares in the Washoe County Bank. Distribution to the widow and children followed, and thereafter the heirs formed a corporation, known as the Estate of W. O'H. Martin, Incorporated. The shares of stock were transferred to the corporation, and on February 19, 1903, 300 shares in the name of the estate were represented by a single certificate. Mrs. Martin testified that some time before February, 1903, she interviewed several directors of the bank about having a representative upon the board of directors of the bank; that she was told by them that she would only have to have a transfer of some stock to her son, Harry M. Martin, in order that he might appear on the books as a stockholder, but that the Estate Company would not have to surrender the ownership of the shares to be transferred. But Mr. Mapes, one of the directors referred to, said that he told Mrs. Martin that no one could be a director unless he owned stock in his own name, and that Mrs. Martin said that either she would let him have stock, or give him stock. In February, 1903, Mrs. Martin went to the bank, and saw Mr. George Taylor, who was then the assistant cashier and assistant secretary, but not a director of the institution. Mr. Taylor went with Mrs. Martin to the stockholders' room in the bank, and there opened her safe deposit box and took out the certificate for 300 shares of stock. Two new certificates were made out by Mr. Taylor, one for 250 shares in the name of the Estate Company, and one for 50 shares in the name of Harry M. Martin. After the certificates of stock were signed by Mr. Ward, a vice president of the bank, Mr. Taylor delivered them to Mrs. Martin, and she handed the 50-share certificate to her son, Harry M. Martin, who immediately indorsed it and handed it back to his mother, who put it in the safe deposit box of the Estate Company. On the following day the son, Harry M. Martin, was appointed a director of the bank; the minutes of the appointment being kept by Mr. Taylor as assistant secretary.

Harry M. Martin remained a director until June, 1905, when he went to Tonopah, and became the owner of 479 shares of stock in the Nye County Mercantile Company. Thereafter, in 1906, Mr. Martin, through Mr. Taylor, who was at that time the agent and bookkeeper of the Martin Estate Company, and also assistant cashier of the bank, obtained a loan of $15,000 from the bank, and gave as security 479 shares which he owned in the Nye County Mercantile Company. At that time the shares in the Nye County Mercantile Company were worth approximately $75,000, and under the agreement of pledge the bank had the right at any time, on nonpayment, to sell the stock or to compel the deposit of additional security. On January 15, 1909, the loan was renewed by Mr. Martin, and again the security of 479 shares of the Mercantile stock were pledged. Checks for the dividends paid upon the shares of stock of the bank were sent by the bank to Harry M. Martin up to 1909. Mr. Martin indorsed them and sent them to his mother, who in turn indorsed them, "Estate of W. O'H. Martin,

Inc., by Louise W. Martin, President," and deposited them with the bank, whereupon they were entered upon the books of the Estate Company as being credited to that corporation; but after 1909 checks were delivered directly to the Estate Company, and, although drawn to Harry M. Martin, were not indorsed by him, but were indorsed by his mother, Mrs. Martin, and deposited in the bank.

It is not disputed that the stock was transferred to Harry M. Martin without consideration, and with a view of having him qualify as a director in the bank, or that the certificate has always remained in the possession of the estate, as heretofore explained. Among the by-laws of the bank there was a provision that no transfer of stock shall be made upon the books of the corporation until after the payment of all calls and assessments made or imposed thereon, and of all indebtedness due to the banking corporation by the persons in whose name the stock stands on the books of the corporation, except with the consent in writing of the president.

Mr. Mapes, who was the president of the bank in 1903, testified that he believed Mr. Martin was the owner of the shares in his name, and that he would not have consented to his being a director if he had not so believed, and that in 1906, when Mr. Martin borrowed the money loaned to him, he had no intimation or knowledge that Martin was not the real owner of the 50 shares. Mr. Rowland, who was also a director when Mr. Martin was appointed, testified to the effect that he believed Martin owned the shares, and that not until 1911 did he know that the shares had been indorsed back to the Estate Company. Mr. Bender, who was the cashier and a director when Mr. Martin was chosen a director, said that it was in 1909 that he first learned that Mr. Martin was not the true owner of the shares in his name. It appeared that on August 9, 1904, at a stockholders' meeting, H. M. Martin represented 50 shares for himself and by proxy 250 shares for the Estate Company, and that at a later stockholders' meeting in 1906 Mr. Bender had a proxy for the H. M. Martin shares, and that Mrs. Martin, at a stockholders' meeting in 1907, voted the H. M. Martin stock and the Estate Company stock, and in July, 1908, the Estate Company voted 250 shares, but that the H. M. Martin shares were not represented. Mr. Bender said that in 1909 Mrs. Martin asked a transfer, claiming ownership for the estate, but that he declined to comply.

The District Court held that prior to the 1909 loan to Mr. Martin the bank had no notice or knowledge that the 50 shares of stock were to stand on the books of the bank in the name of H. M. Martin for the sole purpose of enabling him to qualify as a director, and that the real ownership should be with the estate. The opinion of the District Judge upon this important point shows that the court carefully analyzed and weighed the testimony in reaching a conclusion which would resolve the conflict between the witnesses. In referring to the testimony the court said that conflict and unsatisfactory testimony were not a matter of surprise, when it was considered that the witnesses testified "from memory in 1915 as to conversations which occurred in 1903."

[1] There is, therefore, no sufficient reason for disturbing the finding of lack of knowledge by the bank before the loan of 1909. Mr.

Taylor was not called as a witness, and we agree with the view of the lower court that, although he was a witness of and took part in the matter relating to the formal transfer of the shares, and even saw the delivery of the certificate and the indorsement, it was not proven that he knew that Mr. Martin had no interest in the shares. But if we assume that Taylor knew of an arrangement between Mrs. Martin and her son, as contended for, nevertheless the act of Mr. Taylor in seeking the loan for Mr. Martin does not lead to the belief that Mr. Taylor communicated to the directors of the bank any information that he may have had that Martin was not the real owner of the shares. The loan to Martin was made more than three years after the time and events connected with the transfer, and it is hardly to be presumed that Taylor, who was acting for Martin in obtaining the loan, would disclose to the bank directors that Martin did not own the shares. They say that they had no knowledge, and as against their positive statements, which were accepted by the lower court, we may not safely place possible opposing inferences. Yellow Jacket S. M. Co. v. Stevenson, 5 Nev. 231; Hillyer v. Overman M. Co., 6 Nev. 51; Edwards v. Carson Water Co., 21 Nev. 470, 34 Pac. 381.

[2, 3] The circumstances that Martin was paid the dividends of the 50 shares, and that the bank did not at an earlier date assert its lien, will not raise an equity in favor of the Estate Company which will defeat the lien; nor did the bank, by taking the security of the Mercantile Company shares, waive its lien. Union Bank v. Laird, 2 Wheat. 390, 4 L. Ed. 269; Clark & Marshall on Private Corporations, 171–771. The Estate Company transferred the stock to the name of H. M. Martin, permitted the stock to be voted at stockholders' meetings as the stock of H. M. Martin, and by the evidence made no demand for transfer until after the Mercantile Corporation shares pledged had lost their value. The position of the estate is not strong enough to prevail over the lien created by the by-laws for the indebtedness of Martin, in whose name the stock stood on the books of the Estate Company.

[4, 5] The appellants invoke the doctrine of marshaling of assets, and argue that a creditor cannot assert a lien on the property of a third person, where by his own negligence he has allowed other property, in which the third person has no interest, to become valueless. No assignment of error presenting this point was made, and we therefore pass it, merely observing, however, that the principle seems inapplicable to the case.

These views dispose of the main points, and lead to an affirmance of the decree of the District Court.

Affirmed.